IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TANGY LORIENE NORMAN,

      Plaintiff,

vs.                                              CASE NO. 1:17-cv-97-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting
Commissioner of Social Security (the "Commissioner") denying her
applications for Period of Disability and Disability Insurance Benefits under
Title II of the Social Security Act ("the Act") and for Supplemental Security
Income under Title XVI of the Act. (ECF No. 1.) The Commissioner has
answered, ECF No. 13, and both parties have filed briefs outlining their
respective positions. (ECF Nos. 18, 19.) For the reasons discussed below,
it is recommended that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed her Title II and Title XVI applications on February 16,

2011, alleging a disability onset date of January 20, 2011. (R. 12, 129–30, 136–39, 1094–97.) Plaintiff alleged that she could no longer work due to neck pain, back pain, chest pain, and migraines. (R. 12, 730–46.) Her application was denied initially and upon reconsideration. (R. 35–45, 98–109.) Plaintiff amended the alleged onset date to April 1, 2011. (R. 12, 772–80.) After a hearing, an administrative law judge ("ALJ") issued a decision unfavorable to Plaintiff on November 20, 2012. (R. 556–73.)

The Appeals Council remanded for further consideration. (R. 574–77.) The ALJ then held another hearing on January 26, 2016, and again found on April 8, 2016, that Plaintiff was not disabled. (R. 9D–28.) After this opinion the Appeals Council denied Plaintiff's request for review on February 17, 2017. (R. 9A–9C.) Plaintiff then filed the instant appeal. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. §§ 404.1505, 416.905 (2015).[1] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511, 416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, she is not disabled. §§ 404.1520(b), 416.920(b). Second, if a claimant does not have any

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. §§ 404.1520(c), 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f), 416.920(e)–(f). Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. §§ 404.1520(g), 416.920(g).

## III.  SUMMARY OF THE RECORD

Because the issues on appeal relate primarily to the ALJ's treatment of the opinion evidence, including Dr. Thompson's and Dr. Warchya's opinions, and the ALJ's Residual Functional Capacity ("RFC") assessment, the relevant portions of the medical record, the opinion evidence, the hearing testimony, and the ALJ's findings are summarized below.

## A.  Medical Evidence

Throughout 2010 and to March 2011 Plaintiff visited Gainesville

Primary Care Physicians.[2] Her diagnoses included migraine headaches consistently and neck pain and insomnia frequently. Her physical exam findings were normal other than occasional ear problems as well as neck tenderness and decreased range of motion in November 2010. Her prescribed treatment included medication and at times therapy and exercise. Notably, she reported improvement to her headaches and neck pain from physical therapy and massage therapy.  (R. 217–86, 412–14.)[3]

In May and August 2010 Plaintiff underwent consultations regarding her migraine headaches. Her physical exam findings were normal, and she did not complain of other pain. The impression was chronic daily headaches with strong migrainous features. But the recommended treatment involved only increasing her pain medications. (R. 160–65.)

From May 2010 to February 2011 Plaintiff also visited North Florida Regional Medical Center due to her migraine headaches. She had no other

---

[2] The record contains very little evidence for the time period prior to 2010. There is a CT scan of the brain from October 2007, with normal findings, and records from Shands that reveal that Plaintiff underwent a gastric bypass and liver biopsy in August 2008. (R. 153, 146–54.)

[3] On January 1, 2011, a physician at Primary Care Physicians of Gainesville opined that Plaintiff could return to work on January 21, 2011, with limitations in bending over, reaching overhead, and lifting more than 5 pounds. Additionally, the doctor noted that Plaintiff should not endure prolonged standing, lift more than 10 pounds, operate heavy machinery, or work the night shift. (R. 542.)

complaints other than associated nausea, her physical exam was normal (other than an abnormal ear exam on one occasion), her CT scan findings were stable and showed no acute intracranial findings, and her treatment involved IV and prescription medications. Notably, during each visit she improved after medication.  (R. 167–98, 206–14, 330–66.)

Plaintiff also visited Richard Johansen Physical Therapy from December 2010 to May 2011. By the end of January, it was noted that her migraine headaches were reduced and that her right arm symptoms were gone. Additionally, her range of motion and mobility improved after each visit. Overall, Plaintiff's right upper extremity symptoms resolved well but that she continued to experience migraine headaches, neck pain, and occasional back pain. (R. 512–41, 543–44.)

Plaintiff also visited Florida Pain and Rehabilitation Center from February to June 2011 to address her headaches and neck pain radiating to the right shoulder and arm.[4] Upon examination, Plaintiff exhibited tenderness on bilateral occipital nerve and cervical spine, and she had a positive Spurling sign bilaterally. The diagnoses included stable neck pain,

---

[4] At that time she was working six hours a day and wanted to return to work for more hours if he pain improved.

occipital neuralgia, cervical radiculopathy, C4-5, C5-6 disc protrustion, and lesser extent C6-7 with mild bilateral foraminal stenosis at C5-6, cervical facet joint syndrome, carpal tunnel syndrome on the right side, low back pain, right foot and toe pain, hypertension, and depression.[5] (R. 196–200, 298–302, 312–15, 391–92, 446–50, 458–63, 507–11.)

With regard to procedures and diagnostic testing, Plaintiff underwent a greater occipital nerve block in February 2011, cervical epidural steroid injections in February and March 2011, which offered her some pain relief, and a facet medial branch block in April 2011. She also had an MRI of her cervical spine done in February 2011, which revealed small broad-based central disc protrusion at C4-C5, C5-C6, and C6-C7. There was no cord compression, but there was mild bilateral neural foraminal narrowing at C5-C6.[6] (R. 201–05, 303–11, 317–21, 391–92, 451–57, 497.)

In May 2011 Plaintiff visited the Orthopaedic Institute regarding neck pain and right shoulder and arm pain. Her physical exam findings were normal other than moderate paraspinous muscle spasms, some slight

---

[5] She also had a brain MRI that revealed normal findings.

[6] Other testing in April 2011 by Dr. Warycha revealed evidence for medial nerve entrapment at the wrist consistent with early-to-mild carpal tunnel syndrome, and there was also no evidence for right-sided cervical radiculopathy.

weakness in her right biceps and triceps, and reduced sensory in the right C6-7 distribution. Upon radiographic imaging, the impression was cervical spondylosis causing cervicalgia and intermittent cervical radiculopathy. The recommended treatment plan involved considering anterior cervical diskectomy and fusion at C4-5, C5-6, and C6-7. (R. 296–97, 435–36, 438–39.)[7]

Plaintiff visited Primary Care Physicians of Gainesville from August 2011 to May 2012. Her physical exams revealed overall normal findings, but at times a mildly tender neck with decreased range of motion due to pain as well as lumbar tenderness. Her diagnoses included neck pain, headache/migraine, hypertension, low back pain, muscle spasm, generalized abdominal pain, hematuria, UTI, otalgia, post-gastric surgery syndromes, exposure to communicable disease, and insomnia. The course of treatment involved medication. (R. 415–34.)

Plaintiff returned to Florida Pain and Rehabilitation Center from June 2011 and throughout 2012, and she experienced some relief from the

---

[7] Unrelated to her primary impairments in this case, in June 2011 Plaintiff also visited Shands Hospital for surgery to address abdominal pain due to a complication following her gastric partitioning involving an intra-abdominal abscess. Her physical exam findings were normal other than tenderness in the abdominal area. And her diagnoses included abdominal pain, post-operative infection, intussusception, abscess of abdominal cavity, and obesity. (R. 393–409, 545–54.)

course of treatment during this time. Plaintiff underwent trigger point injections in March and May 2012, and she experienced 50% pain relief. In October 2012 Plaintiff underwent a facet medial branch block of the cervical and thoracic spine, which resulted in 100% pain relief. She also underwent lumbar epidural steroid injections in November 2012. The notes also reflect that her medication and physical therapy were helping some. (R. 367–91, 410–11, 464–90, 492–93, 499–500, 1000–08.)[8]

Plaintiff continued at the Florida Pain and Rehabilitation Center in 2013 and 2014. She stated that her medication was helping some and that she was not experiencing any side effects. Her treatment continued to involve medication only, which provided adequate relief, and she declined procedures and surgical consults. She did, however, undergo a trigger point injection in October 2013 to address her occipital neuralgia. But in February 2014 Plaintiff was permanently discharged from the clinic due to violating the narcotic contract. (R. 903–04, 1009–25.)

Plaintiff returned to Primary Care Physicians of Gainesville in January 2014. Her physical exam findings were normal other than

---

[8] Notably, some of the treatment notes indicate that Plaintiff was working part time, and others indicate that she was working full-time. *See, e.g.*, ECF No. 377, 381.

tenderness over the cervical and thoracic spine. Her assessments included insomnia, anxiety, migraine headaches, and neck pain. But her treatment involved medication only. (R. 899–902.)

In March 2014 Plaintiff underwent diagnostic cervical facet joint injections at C4/C5, C5/C6, and C6/C7 at the Laser Spine Institute. After the procedure, Plaintiff reported 100% improvement. Her cervical MRI/CT scans revealed degenerative disc disease, bulging disc, foraminal stenonosis, facet degen/hypertrophy, and osteophytes at the C4/C5, C5/C6, and C6/C7 levels. Additionally, spinal stenosis in cervical region, displacement of cervical intervertebral disc without myelopathy, cervical spondylosis without myelopathy, and degeneration of the cervical intervertebral disc were noted. Then in June 2014 Plaintiff underwent a radiofrequency denervation to the dorsomedial nerves located at C4, C5, C6, and C7 areas at North Florida Surgical Pavilion.  (R. 827–44, 850–51, 860–65, 919–44, 985–87.)

Plaintiff also visited Southeastern Rehabilitation Medicine in 2014 and 2015 regarding pain management for cervical pain, low back pain, and migraine headaches. In 2014 her physical exam findings revealed tenderness over the cervical and thoracolumbar spine as well as restricted

cervical spine range of motion, but a note in the findings stated she exhibited "pain behaviors of overreaction, superficial tenderness and severe guarding." In 2015 her physical exam findings revealed tenderness of the neck and neck pain with motion as well as lumbosacral tenderness, but all other findings were normal. Her assessments included backache, cervical spondylosis (C4-C5), chronic common migraine, cervicalgia, depression, anxiety disorder, and chronic pain syndrome. Her treatment, however, included medication and home exercise as tolerated. (R. 858–59, 867–83, 908–12, 945–84, 987–98, 1029–59, 1068–72, 1074–86.)[9]

Plaintiff also visited Southeastern Health Psychology in 2014. Her diagnostic classification included bipolar disorder, posttraumatic stress disorder, and pain disorder associated with both psychological factors and general medical condition. Due to the complexity of her medical and psychiatric problems, Plaintiff was referred to Shands Vista outpatient services. (R. 1065–67.)[10]

---

[9] Also unrelated to Plaintiff's primary impairments, her records reveal that Plaintiff went to the North Florida Regional Medical Center in November 2014 due to chest pain, but her portable chest exam was unremarkable. (R. 1073.)

[10] Notably, her records state, "Physical disability but able to perform usual physical activities for age." (R. 1066.)

## B.  Opinion Evidence

### 1. Nicolas Bancks, M.D.

Dr. Bancks, a medical consultant, completed a physical RFC assessment on July 14, 2011. He found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and she could sit, stand, and/or walk for about 6 hours in an 8-hour workday. Plaintiff also had limited push and/or pull in her upper extremities, and she could only occasionally climb, balance, stoop, kneel, crouch, and crawl. She also needed to avoid concentrated exposure to hazards, such as machinery and heights. Dr. Bancks also specifically noted that there was no objective basis to limit Plaintiff to sedentary work. (R.322–29.)

### 2. Bohdan Warycha, M.D.

Dr. Warycha signed a physical medical source statement in July 2012. Her diagnoses included neck pain, cervical radiculopathy with HNP, occipital neuralgia, carpal tunnel syndrome, lower back pain, and headaches. Her symptoms included neck pain, lower back pain, bilaterla knee pain, and migraine type headaches.  The objective evidence included tenderness over the cervical and lumbar spine as well as the straight leg raising test. (R. 502–03.)

Regarding Plaintiff's functional limitations, Dr. Warycha found that Plaintiff could walk 50 feet without rest or severe pain, sit for 1 hour and 20 minutes at one time, and stand for 1 hour and 15 minutes at one time. In a total 8-hour workday, Plaintiff could sit and stand/walk for less than 2 hours. It was noted that she would need a job that permits shifting positions and that she would need to walk for 5 minutes every 20 minutes. She would also need to take a 30-minute break every 30 to 60 minutes, lie down 4 or 5 times a day for 20 to 30 minutes, and elevate her legs 50% of the day. The need for these breaks was attributed to muscle weakness, chronic fatigue, pain/paresthesias, numbness, and adverse effects of medication (drowsiness).  (R. 503.)

With regard to other limitations, Plaintiff could only rarely lift less than 10 pounds and only rarely twist and stoop. Additionally, she could never crouch/squat, climb stairs, or climb ladders. It was also noted that Plaintiff would be off task 25% or more of the workday because her symptoms would be severe enough to interfere with her attention and concentration. She would also be absent more than four days per month. (R. 504–05.)

## C.  Hearing Testimony

During the hearing held on January 26, 2016, an orthopedic medical

expert, Dr. Robert Thompson, testified. He stated that the objective musculoskeletal evidence appears to meet 1.04 paragraph A from April 2011 to January 2012, which is not a 12-month period. He further testified that Plaintiff could lift and carry 10 pounds occasionally, but not frequently and nothing heavier than 10 pounds. Plaintiff could sit, stand, and walk at one time a maximum of one hour at one time. In an eight-hour workday, Plaintiff could sit for four hours and stand and walk for three hours. He said that he limited Plaintiff's ability to sit, stand, and walk due to her pain in the neck and knees as well as actual neurological abnormalities. (R. 1184–98.)

As for other limitations, Plaintiff could not reach overhead, but she could do other reaching and handling as well as pushing and pulling occasionally. She could finger and feel frequently, but only occasionally use stairs and ramps. Plaintiff could not use ladders or scaffolds, crawl, occasional stoop, kneel, or crouch. Plaintiff also must avoid heavy vibration and only occasionally be exposed to extreme heat. (R. 1196–97**)**

Dr. Thompson, however, testified that Plaintiff can work an eight-hour workday, but that she needs increased periods of breaks and some rest time. Specifically, he said that Plaintiff would need to lie down for an hour a day based on neck pain and her neck condition. (R. 1197–99.)

Plaintiff also testified at the hearing. With regard to her work history, Plaintiff testified that she worked doing janitorial work as well as acted as a supervisor for housekeeping at the Red Roof Inn in 2002 and then at different locations from 2005 to 2011. Plaintiff said that she has not attempted to return to work since 2011 when she was terminated for having frequent migraines. (R. 1200–12.)

Plaintiff also stated that she started having migraines after a car accident five or six years prior to the hearing because neck pain from the accident would trigger migraines. During that time, she was also experiencing back pain, right shoulder pain, and right hand pain. She testified that she saw pain management regarding this injuries, and her treatment included injections in her neck and back as well as pain medication. She also underwent massage therapy, but she never had surgery. Plaintiff said that the injections and medication offered her some relief from the pain. (R. 1213–24, 1235–38.)

With regard to her physical limitations, Plaintiff testified that she can only stand and sit for about 45 minutes to an hour before needing to take a stretch or change positions. She also said that she could walk for about a half of a block before needing to take a rest due to lower-back pain and

that walking that distance would take her about 15 minutes. Additionally,

Plaintiff can carry things so long as they do not weigh more than 10

pounds. Plaintiff also stated that when she was working she would have to

lie down every morning and then at least every three days for two hours.

(R. 1225–31, 1238.)

Plaintiff also testified as to her daily activities. She said that she is

able to prepare meals, wash dishes, do laundry, and make the bed, but it

takes her a long time. She stated, however, that she does not do things

like vacuuming because it would cause her pain. (R. 1231–35.)

## D.  The ALJ's Findings

The ALJ found that Plaintiff has not engaged in substantial gainful

activity since April 1, 2011, the amended alleged onset date. The ALJ also

found that she has the following severe impairments: a history of cervical

spine pain secondary to degenerative joint disease and facet changes at

C-4 to C-7, history of migraines, history of obesity, and some insomnia.

However, none of these impairments, or a combination thereof, meets or

medically equals the severity of one of the listed impairments. (R. 14–15.)

Based on the entire record, the ALJ concluded that through the date

last insured, Plaintiff had the following residual functional capacity ("RFC"):

[Plaintiff can] perform a range of light work . . . including the ability to sit for 6 hours and stand and walk for 4 hours each in an 8-hour workday, with the ability to alternate her position between sitting and standing and walking at least every 30 minutes. She is able to occasionally lift and carry 10 pounds and more frequently lift and carry less than 10 pounds. She has no limitation in the push/pull operation of foot/pedal controls; the push/pull operation of bilateral arm/hand controls is limited to occasionally. [Plaintiff] is able to climb ramps and stairs occasionally and she is precluded from climbing ladders, ropes and scaffolds. She needs to avoid crawling; all other postural maneuvers are limited to occasionally. Turning her head from side to side and up or down is limited to an occasional or less basis. She is able to frequently reach in all directions except that she needs to avoid reaching overhead bilaterally. She is limited to frequent handling, fingering and feeling. She needs to avoid work at unprotected heights, around dangerous moving machinery and in proximity to concentrated industrial vibration. There are no mental limitations.

(R. 16.)

The ALJ then found that Plaintiff was not capable of performing any past relevant work. However, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. Accordingly, the ALJ concluded that Plaintiff has not been under a disability from April 1, 2011, through the date of the ALJ's decision, April 8, 2016. (R. 26–28.)

## IV. DISCUSSION

Rather than identifying the precise nature of her argument on appeal

Plaintiff instead describes her argument as follows:

> Obviously, substantial evidence does not support ALJ Thompson's denial of benefits to Plaintiff Norman. Based on all of the medical records and the testimony of the medical expert it is clear that the substantial evidence establishes that Plaintiff Norman, as a result of her combination of impairments, is simply not capable of working eight hours a day five days a week at the sedentary, or any other, exertional level, because of her need to lie down for an hour a day as opined by the medical expert. Additionally, Plaintiff Norman's treating physician, Dr. Warycha opined that Plaintiff Norman would be absent from work, as a result of her impairments or treatment more than four days per month.

(ECF No. 18 at 34.)  In support of this run-on argument Plaintiff provided only one citation to the record in her entire argument section, a four-page citation to a physical medical source statement signed by Dr. Warycha. (R. 502–05.)

Plaintiff elaborated on this argument only briefly. Plaintiff argued that "it was . . . impermissible for ALJ Thompson to substitute his judgment for that of the medical expert." She also asserted that "ALJ Thompson also violated the treating physician rule by rejecting the opinions of Plaintiff's treating physicians." (ECF No. 18 at 35–36.)[11] Other than reciting case law,

---

[11] Plaintiff fails to specify what opinion evidence from her treating physicians the ALJ rejected. Rather, without citation to the record, Plaintiff simply says, "[c]learly the opinion evidence rendered by these treating physicians was based upon a history of treatment of Plaintiff Norman. Additionally, the doctors independently reached the same opinion regarding Plaintiff Norman's lack of ability to function in the work place it [sic]

Plaintiff offers little other argument regarding her medical records or why this Court should reverse and remand the decision of the ALJ.

Rather than focusing her argument on an identifiable issue and rather than discussing the ALJ's decision, the Court is left with the task of attempting to identify the arguments Plaintiff is attempting to advance in this case. Liberally construing Plaintiff's conclusory arguments, the Court construes Plaintiff's argument to be a challenge to the ALJ's treatment of the opinion evidence in the record, specifically the opinions of Dr. Thompson, the medical expert at the hearing, and Dr. Warycha, one of Plaintiff's treating physicians. Also, Plaintiff makes the more general argument (without evidentiary support) that substantial evidence does not support the ALJ's decision.

With regard to opinion evidence generally, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam)). This information and explanation allows "a

over the court of a single workday, or more globally over the course of the work month." (ECF No. 18 at 36.)

reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* at 1178–79 (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

This does not mean, however, that an ALJ must adopt every medical opinion in the record. To the contrary, an ALJ may reject a medical opinion if the evidence supports a contrary finding. *McCloud v. Barnhart*, 166 F. App'x 410, 418–19 (11th Cir. 2006). Additionally, the opinions of examining physicians are typically entitled to more weight than the opinions of non-examining physicians. *Broughton v. Heckler*, 776 F.2d 960, 961–62 (11th Cir. 1985).

With regard to a treating physician's opinion, the ALJ must give that opinion controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2). But the ALJ may discount the treating physician's opinion if good cause exists to do so. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).[12]

---

[12] Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data

If an ALJ rejects a treating physician's opinion, he must give explicit,

adequate reasons for so doing, and failure to do so results in the opinion

being deemed accepted as true as a matter of law. *MacGregor v. Bowen*,

786 F.2d 1050, 1053 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837,

841 (11th Cir. 1992). The Commissioner's reasons for refusing to credit a

treating physician's opinion must be supported by substantial evidence.

*MacGregor*, 786 F.2d at 1054.

In this case the Court concludes that the ALJ did not err in his

treatment of the opinion evidence, including the opinions of Dr. Thompson

and Dr. Warycha.  In Plaintiff's brief she completely ignores any reference

to the ALJ's lengthy, detailed discussion of the weight the ALJ gave to

each opinion in the record. Instead, Plaintiff appears to insist that the ALJ

was required to adopt all of the limitations included in the various

opinions.[13] But the law is clear: the ALJ is not required to adopt every

---

or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or
the opinion "is not accompanied by objective medical evidence." *Lewis v. Callahan*, 125
F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.
1991) (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).

[13] For example, Plaintiff attempts to suggest that because the medical expert
opined that she needed to lie down for an hour each day and because Dr. Warycha
opined that she would be absent from work four days per month, substantial evidence
supports a finding of disability. (ECF No. 18 at 34.)

limitation in every opinion; the ALJ must only state the weight he gives each opinion and explain why.

Turning first to the opinion of Dr. Thompson—the medical expert who testified at the supplemental hearing in January 2016— Dr. Thompson testified about the physical limitations Plaintiff experienced as a result of her alleged impairments. Dr. Thompson concluded that Plaintiff could lift and carry 10 pounds occasionally; sit, stand, and walk for one hour at one time; and sit for four hours and stand and walk for three hours in and eight-hour workday. He limited Plaintiff's ability to sit, stand, and walk due to her pain in the neck and knees as well as actual neurological abnormalities. (R. 1184–98.)

As for other limitations, Dr. Thompson concluded that Plaintiff could never reach overhead; occasionally do other reaching, handling, pushing, and pulling; frequently finger and feel; occasionally use stairs and ramps; and never use ladders or scaffolds, crawl, occasional stoop, kneel, or crouch. He also testified that Plaintiff must avoid heavy industrial vibration and only occasionally be exposed to extreme heat. Many of these limitations were based on cervical spine issues. (R. 1196–97**)**

Dr. Thompson concluded that Plaintiff can work an eight-hour

workday, but that she needs increased periods of breaks and some rest

time. Specifically, he said that Plaintiff would need to lie down for an hour a

day based on neck pain and her neck condition. (R. 1197–99.)

In discussing the weight given to Dr. Thompson's opinion, the ALJ

wrote:

> To the extent this opinion is consistent with the objective
> medical findings, including MRI findings that failed to show
> nerve root compromise of the cervical spine, as well as the lack
> of ongoing evidence of neurological deficits and the findings on
> the earlier nerve conduction studies which failed to show any
> cervical radiculopathy, the [ALJ] gives some partial weight to
> this assessment. However, little weight is given to Dr.
> Thompson's opinion that limits [Plaintiff's] ability to stand/walk
> only 3 hours total in an 8-hour workday, the need for increased
> breaks and the need to lie down for an hour per day, as this
> opinion evidence is not supported by the radiographic and
> clinical findings or by the course of conservative treatment
> without evidence of the need for any surgical intervention.

(R. 25.)

Thus, the ALJ stated with particularity the weight given to various

portions of Dr. Thompson's opinion as well as the reasons for assigning

only partial weight to certain limitations. More specifically, as the ALJ

explained, he discounted the portions of Dr. Thompson's opinion that were

unsupported by the evidence in the record, an appropriate reason to

dsicount an opinion.[14]

The second opinion specifically at issue is the medical source statement from July 2012 signed by Dr. Warycha, one of Plaintiff's pain management treating physicians.[15] The source statement first reflects Plaintiff's diagnoses and symptoms and then discusses objective evidence including tenderness over the cervical and lumbar spine as well as the straight leg raising test. (R. 502–03.)

The source statement also lists Plaintiff's functional limitations. The source statement notes that Plaintiff could walk 50 feet without rest or severe pain; sit for 1 hour and 20 minutes at one time; stand for 1 hour and 15 minutes at one time; and sit and stand/walk for less than 2 hours in an 8-hour workday. Further, it reflect that she would need a job that permits shifting positions; would need to walk for 5 minutes every 20 minute; would need to take a 30-minute break every 30 to 60 minutes; would need to lie

---

[14] In his decision, the ALJ specifically stated that "a restriction to lie down is not reflected in any of the treating source medical records." (R. 23.) So to the extent that Plaintiff argues that this portion of Dr. Thompson's opinion should have been adopted, the ALJ has made clear why he refused to do so.

[15] Dr. Warycha's opinion is the only opinion that Plaintiff actually cites to in her argument.  Although the medical source statement is signed by Dr. Warycha, a letter following the medical source statement states that Richard Johansen, Plaintiff's physical therapist, completed it. (R. 506.)

down 4 or 5 times a day for 20 to 30 minutes; and would need to elevate

her legs 50% of the day. These breaks would be necessary due to muscle

weakness, chronic fatigue, pain/paresthesias, numbness, and adverse

effects of medication (drowsiness). (R. 503.)

    With regard to other limitations, the source statement reflects that

Plaintiff could rarely lift less than 10 pounds; rarely twist and stoop; and

never crouch/squat, climb stairs, or climb ladders. She should avoid

extreme temperatures and environments posing hazards. Additionally,

Plaintiff would be off task 25% or more of the workday and would be

absent more than four days per month.[16] (R. 504–05.)

    In evaluating the weight the ALJ assigned to this opinion, the ALJ

provided an exceptionally thorough and detailed explanation supporting his

reasons for not give the treating physician's opinion controlling weight. The

ALJ explained:

> This opinion is afforded little weight to the extent that these
> assessed functional limitations are inconsistent with the
> residual functional capacity reached in this decision, as there is
> no objective medical documentation to support most of these
> functional limitations and there is no cogent medical rationale
> ever afforded to explain how this physician came to these

---

[16] The portion of the opinion Plaintiff specifically references is the opinion that
Plaintiff would be absent from work more than four days per month.

conclusions (Exhibits 18F, 20F, 22F). Furthermore, this opinion is not supported by the objective medical findings, which show rather benign objective medical findings, including the minimal MRI findings as well as the lack of significant clinical findings in terms of any loss of motor or muscle strength, reflex loss and loss of sensation. Likewise, this opinion is not consistent with the testimony of Dr. Kendrick the impartial medical expert who is a more qualified medical source in the field of musculoskeletal disorders as discussed in detail below. Furthermore, this opinion is not consistent with the primary care physician's opinion, as previously noted (Exhibit 21F). As an example, the pain management physician limits this claimant's ability to sit, stand and walk rather substantially, however, the results of a May 2012 lumbar spine MRI clearly fail to demonstrate any significant abnormalities regarding her lower back (Exhibit 16F/54-55). Under these circumstances, it is difficult to understand how this claimant would be limited to only sitting for no more than 2 hours in a normal workday. Many of the other functional limitations such as the need for unscheduled work breaks are inadequately explained or rationalized so as to afford the undersigned some understanding as to how this physician reached these conclusions. To the extent that this medical source statement makes conclusions about this claimant's medical conditions, many of the asserted diagnoses proffered by the physical therapist and Dr. Warycha are simply wrong or not supported by the objective findings. For example, this source statement suggests that the claimant had findings consistent with a herniated cervical disc or some cervical radiculopathy; however, MRI studies and the results of a nerve conduction study interpreted by this same physician do not support these conclusions. The MRI of her lumbar spine could not reasonably be interpreted to demonstrate any basis for complaints of back discomfort and her neurological exams of the back are routinely normal. Her carpal tunnel syndrome is not correlated with any consistent clinical findings such as a positive Phalen's or Tinel's sign and she never underwent any injective therapy into

her right wrist. She has, in fact, had no treatment for her carpal tunnel condition. Her headaches were felt to be related to some occipital neuralgia and were addressed with some injective therapy. The severity of the assessed functional restrictions are simply unsupported by the objective medical findings.

(R. 24.)[17]

Thus, as evidenced in the ALJ written decision the ALJ discounted

Dr. Warycha's opinion for at least the following reasons. First, the ALJ

noted that Dr. Warycha extreme limitations are not unsupported by and in

many instances are contradicted by the medical and opinion evidence in

the record, including Dr. Warycha's own treatment notes and diagnostic

testing.  There is no error in an ALJ discounting a treating physician's

--------------------------------

[17] The ALJ is not the only person who found the extreme limitations in this opinion problematic in light of the record as a whole. Dr. Kendrick, the medical expert who testified at the first hearing, also disagreed with the findings in the opinion "because the medical evidence does not support such a conclusion and there is no credible medical basis for that degree of limitation of function . . . ." Furthermore, the ALJ noted the following regarding Dr. Kendrick's opinion:

> Dr. Kendrick stated that the claimant had no impairment to the left hand or left arm to support the treating physician's opinion that the claimant could grasp or reach in all directions only 50 percent of the time. Further, he stated the treating physician's opinion that the claimant could use the right hand only 10 percent of the time, which Dr. Kendrick felt was likely due to shoulder dysfunction from her cervical impairment, was not supported by the lack of objective findings. Specifically, Dr. Kendrick stated there was no evidence of any cervical spinal stenosis, nerve root compromise or abnormal neurological findings and that the claimant's spinal impairment was age-related.

(R. 25.)

opinion where the opinion is inconsistent with the doctor's own medical

records and is not supported by clinical data.  *Lewis v. Callahan*, 125 F.3d

1436, 1440 (11th Cir. 1997) (finding good cause where the evidence

"supports a contrary finding," the opinion is "conclusory," the opinion is

"inconsistent with [the treating physician's] own medical records," and the

statement "contains no [supporting] clinical data or information").

Plaintiff offers no specifics addressing how the ALJ violated the

treating physician's rule or how the ALJ's detailed reasoning for rejecting

the opinion was improper. The Court declines to speculate as to what

Plaintiff could have or should have argued in this regard. Instead, because

the ALJ had good cause for giving little weight to the opinion of Dr.

Warycha and because the ALJ provided adequate, explicit reasons for

doing so that were supported by substantial evidence, the Court concludes

that the ALJ did not err in his assessment of Dr. Warycha's opinion. *See*

*MacGregor*, 786 F.2d at 1054.

Although Plaintiff makes no specific reference to opinion evidence

from anyone other than the medical expert and Dr. Warycha, the Court,

nonetheless, will briefly discuss the ALJ's treatment of the other opinion

evidence in the record. This other opinion evidence included opinions from

Dr. Subramanian, Dr. Kendrick, and the State agency physicians.

With regard to each of these opinions, the ALJ discussed with particularity the weight he gave to reach opinion and the reasons therefor. The reasons the ALJ offered for discrediting the opinions were all proper, including the fact that they were unsupported by Plaintiff's objective medical findings and her conservative course of treatment. Additionally, where the ALJ assigned greater weight to an opinion, he did so appropriately based on the consistency of the opinion with the rest of the record evidence. (R. 23–25.) Accordingly, the Court concludes that the ALJ did not err in his treatment of any of the opinion evidence in the record.

Lastly, in a conclusory fashion—and with little or no discussion of the record— Plaintiff argues that substantial evidence does not support the ALJ's findings in this case. But other than a reference to Dr. Thompson's opinion that Plaintiff would need to lie down for one hour each day and a reference to Dr. Warycha's opinion that Plaintiff would be absent more than four days per month, Plaintiff provides no citation to or any discussion of other evidence in the record that would constitute substantial evidence to support a finding of disability.

In stark contrast to Plaintiff's unsupported allegation that she is

disabled, the ALJ's detailed decision concluding that Plaintiff is capable of

light work with limitations is supported by substantial evidence. The ALJ's

decision includes a thorough discussion of all of the evidence in the record.

With regard to the medical evidence, the ALJ's decision summarizes

Plaintiff's treatment records and findings related to Plaintiff's

musculoskeletal impairments, insomnia, and migraine headaches as well

as references to Plaintiff's overall conservative course of treatment.   The

ALJ's decision also summarizes Plaintiff's testimony regarding her

functional limitations and daily activities.

Based upon all of the evidence in the record, the ALJ found that

Plaintiff was not disabled. (R. 18–26.)

Having considered all of the evidence, the ALJ found that the record

supports a finding that Plaintiff had severe impairments from a history of

cervical spine pain with degenerative joint disease and facet changes, a

history of migraines, obesity, and some insomnia. But the ALJ found that

the record does not support the degree of functional limitation Plaintiff

alleges or the preclusion of all work activity.[18] Instead, the ALJ concluded

---

[18] In elaboration, the ALJ stated that Plaintiff's "contentions are not supported by clinical or laboratory findings establishing impairments, which reasonably could be expected to cause such limitations, they are inconsistent with other evidence and the

that Plaintiff was capable of performing light work with the additional

limitations discussed above that account for Plaintiff's impairments as

supported by the record evidence. (R. 15–26.)

Accordingly, the Court concludes that the ALJ properly considered

and discussed all the opinion evidence in the record and that substantial

evidence supports the ALJ's RFC determination and finding that Plaintiff is

not disabled.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 7th day of June 2018.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations
must be filed within fourteen (14) days after being served a copy
thereof. <u>Any different deadline that may appear on the electronic
docket is for the court's internal use only, and does not control.</u> A**

---

overall evidence does not persuasively establish excess pain or greater limitations." (R.
23.)

copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.